893 P.2d 732

**J.D.S.; and J.L.S., a minor child, Petitioners,**

v.

**The Honorable Pamela J. FRANKS, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,**

**G.H. and K.H., Real Parties in Interest,**

**Pamela G. Wiens, guardian ad litem for the minor child, Intervenor.**

**No. CV–94–0148–SA/PR.**

Supreme Court of Arizona, En Banc.

April 11, 1995.

David L. Rose, P.C. by David L. Rose, Phoenix, for petitioners.

Jennings, Strouss & Salmon, P.L.C. by Rita A. Meiser, James M. Ackerman, Robert D. Haws, Phoenix, for real parties in interest.

Pamela G. Wiens, Guardian ad litem, Phoenix, for minor child—intervenor.

Grant Woods, Atty. Gen. by Virginia L. Richter, Asst. Atty. Gen., Phoenix, for amicus curiae Ariz. Dept. of Economic Security.

Ann M. Haralambie, P.C. by Ann M. Haralambie, Tucson, for amicus curiae Ariz. Council of Attys. for Children, Inc.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Richard J. Woods, Franzula M. Bacher, Christopher Robbins, Phoenix, for amici curiae Children's Legal Clinic and American Academy of Adoption Attys.

Charles G. Ollinger, III, Paradise Valley, for amicus curiae Family & Friends in Support of Divorce Reform, Inc.

## OPINION

CORCORAN, Justice.

This case involves a tug-of-war between a natural father in Arizona and a couple in Florida seeking to adopt his minor child. It also involves the consideration of three overlapping statutes. We accepted jurisdiction of this special action to decide whether the trial court erred when it declined jurisdiction in this child custody dispute and deferred to the Florida trial court. Contrary to the court of appeals, we hold that the trial court decided this issue correctly insofar as it quashed the warrant for immediate production of the child and the writ of habeas corpus, and we vacate the opinion of the court of appeals.

We granted the petition for review and treat it as a special action because of the need for a quick resolution of this case. *See J.A.R. v. Superior Court,* 179 Ariz. 267, 273, 877 P.2d 1323, 1329 (App.1994) (accepting special action jurisdiction because "this case involves the custody placement of a young child, as well as a significant issue of law that may be decided as well now as in a later appeal that may involve unconscionable delay in resolving the child's placement"). Therefore, there is no equally plain, speedy, and adequate remedy by appeal. Rule 8(a), Arizona Rules of Procedure for Special Actions; *see also* Ariz. Const. art. 6, § 5(3).

### *Facts and Procedural History*

On August 8, 1993, K.W.[1] (mother) gave birth to a baby girl in Phoenix, Arizona. K.W. was single and had one child from a former marriage. She was 23 years old at the time of the child's birth and was unemployed. K.W. had lived briefly with the child's biological father, J.D.S. (father), but at the time of the child's birth, they did not live together.

Before the birth of her child, the mother expressed interest in placing her child for adoption and contacted an adoption attorney, Kerry B. Moore, whose name she found in the yellow pages of the phone book. Upon the birth of her baby girl, however, she changed her mind and decided to keep the baby. After a few months of attempting to care for two children, she changed her mind once again and decided to place the child for adoption. K.W. had previously spoken with another adoption agency that refused to go forward with an adoption because of K.W.'s indecisiveness. K.W. contacted Ms. Moore again, and on November 22, 1993, K.W. consented to an adoption and signed the appropriate forms.

Through Ms. Moore, K.W. provided the requisite information to the Arizona and Florida administrators of the Interstate Compact for the Placement of Children (ICPC). She provided to the ICPC administrators J.D.S.'s name, address, and relationship to the child in an Affidavit as to Birth Father. On November 23, 1993, the Arizona administrator of the ICPC approved the placement of the baby with the prospective adoptive parents, G.H. and K.H. (adoptive parents). And on November 24, 1993, the Florida administrator of the ICPC approved the placement.

1. To protect the anonymity of the parties, we will refer to the minor child, the biological parents, and the adoptive parents by their initials only.

K.W. met K.H., who had travelled from Florida, and physically released the baby girl to K.H. K.H. transported the child to Florida on November 24, pursuant to approval from the ICPC administrators. A licensed Florida adoption agency, A Bond of Love Adoption Agency, Inc., had previously completed a homestudy of G.H. and K.H. and recommended approval of them as adoptive parents. On November 30, 1993, G.H. and K.H. initiated adoption proceedings in the Circuit Court of Florida.

The mother made several conflicting sworn statements regarding the pertinent facts of this case. In some statements, she said that J.D.S. was violent and did not support her during her pregnancy. She stated that he also failed to support the child, except for sporadic purchases of formula and diapers. In other statements, K.W. repudiated those statements about J.D.S. and said that he was a good father to the child.

Dr. Rosi D. Fortunato, a pediatrician, examined the baby soon after her arrival in Florida. He described her condition "as a classic medical picture of child neglect." The baby was underweight and had severe diaper rash. Dr. Fortunato reported that, under the care of G.H. and K.H., the child had "progressed very well" and gained weight.

This case arose because the biological father opposes the Florida adoption. The original birth certificate, prepared the day of the child's birth, does not identify the father and designates the mother's surname as the child's last name. On December 3, 1993, however, another birth certificate was issued listing J.D.S. as the father and designating his surname as the child's last name.[2] On December 7, 1993, J.D.S. filed for and received an Order of Paternity.[3] That same day he filed a petition for writ of habeas corpus in Maricopa County Superior Court in Arizona, and the trial court issued the writ

directing that the child be returned. G.H. and K.H. specially appeared to contest jurisdiction in Arizona, and the trial court ordered the parties to submit briefs on the issue of jurisdiction.

The Arizona trial court held a hearing on January 14, 1994, with the Florida trial court, the adoptive parents, and the parents' Florida attorneys participating by telephone. The Arizona trial court found that the Uniform Child Custody Jurisdiction Act (UCCJA) was inapplicable to this case and was superseded by the ICPC. The Arizona trial court also found that the ICPC applied to this case because both Arizona and Florida had adopted the compact, and the procedures set forth in that compact were followed. The Arizona trial court concluded that it lacked in personam jurisdiction to issue or enforce a writ of habeas corpus with respect to the adoptive parents. Therefore, the Arizona trial court quashed the warrant for immediate production and writ of habeas corpus issued on December 7, 1993. Further, the trial court denied the petition for writ of habeas corpus.

Thereafter, J.D.S. filed a petition for special action in the Arizona Court of Appeals alleging that, under the ICPC, Arizona retained jurisdiction. The court of appeals accepted jurisdiction of the special action, vacated the trial court's order, and instructed the trial court "to take all necessary measures to secure the return of the child to the State of Arizona." *J.D.S. v. Superior Court,* 182 Ariz. 98, 107, 893 P.2d 749, 758 (App. 1994).

Unlike the Arizona trial court, the court of appeals concluded that the UCCJA applies to this adoption case, and to child custody cases in general, and has not been superseded by the ICPC. The court of appeals held that "under the UCCJA *only Arizona* has juris-

---

**2.** According to J.D.S.'s affidavit, K.W. told him on December 3 that she had given up the minor child for adoption. She had previously told him that Arizona Child Protective Services had taken the child away.

**3.** If the mother is unmarried at the time of birth and was unmarried throughout the preceding 10 months, the name of the putative father "shall *not* be entered on the birth certificate *unless*" (1)

sworn statements acknowledging paternity are voluntarily presented by both the mother and the putative father, or (2) paternity is established by a court of competent jurisdiction. A.R.S. § 36–322(G) (emphasis added). Therefore, placement of the father's name on the December 3 birth certificate was not in compliance with this statute.

diction to consider the instant child custody dispute." *J.D.S.*, 182 Ariz. at 105, 893 P.2d at 756 (emphasis added). The court of appeals stated that Florida was not in substantial conformity with the UCCJA "because Arizona is both the child's home state and the state with the closest connection to the child." *J.D.S.*, 182 Ariz. at 105, 893 P.2d at 756.

The court of appeals further stated that under the ICPC, Arizona retained jurisdiction over this matter because the ICPC states that the "sending agency shall retain jurisdiction over the child ... until the child is adopted." *J.D.S.*, 182 Ariz. at 106, 893 P.2d at 757, quoting A.R.S. § 8–548, art. V(a). In addition, the court of appeals stated that "the provisions of the Compact were not complied with prior to the transfer of the child to Florida." In particular, the court of appeals noted that the sending agency did not provide all pertinent information in the ICPC forms, and the ICPC administrators approved the transfer of the child without notice to the father. *J.D.S.*, 182 Ariz. at 106, 893 P.2d at 757. The court of appeals also held that the father's due process rights were violated because he received no notice before the child was placed in Florida. *J.D.S.*, 182 Ariz. at 102–103, 893 P.2d at 753–754.

Judge Contreras dissented from the court of appeals' opinion. First, he stated that the Arizona court lacked the power to issue a writ of habeas corpus to secure the return of a child present in Florida. Second, he agreed with the majority that Arizona is the child's home state, but contended that the Arizona court could not collaterally attack Florida's jurisdiction because the issue of Florida's jurisdiction had not been fully and fairly litigated in Florida. *J.D.S.*, 182 Ariz. at 108, 893 P.2d at 759 (Contreras, J., dissenting).

Not satisfied with the result in the court of appeals, the adoptive parents filed a motion for emergency stay in the Arizona Supreme Court. The Florida trial court had enjoined G.H. and K.H. from removing the child from Florida, and they so advised this court and the Arizona trial judge. G.H. and K.H. filed a petition for review with this court, which the court treated as a special action. On June 29, 1994, we granted the following relief by Order: (1) the court of appeals' opinion was vacated; (2) the trial court's order quashing the warrant for immediate production and writ of habeas corpus and denying the petition for writ of habeas corpus was affirmed; (3) the orders following the remand from the court of appeals were vacated and quashed; and (4) the case was remanded to the trial court for any further proceedings consistent with the June 29 order, with this formal opinion to follow.

### Issue Presented

To start with, this is not a case where Florida has jurisdiction, and Arizona does not. Both Florida and Arizona have jurisdiction. The issue presented to us is:

Did the court of appeals err in concluding that the trial court abused its discretion by deferring to the prior Florida proceeding?

We conclude that the court of appeals did err and that the trial court appropriately deferred to the Florida proceeding.

### Discussion

#### I. Statutory Background

This case involves the interplay of several statutes, namely the Uniform Child Custody Jurisdiction Act, the Parental Kidnapping Prevention Act (PKPA), and the Interstate Compact on the Placement of Children. A brief explanation of how these statutes operate will be helpful to an understanding of this opinion.

#### A. The Uniform Child Custody Jurisdiction Act

The UCCJA is a uniform act, adopted in some form by all 50 states, that establishes which court has subject matter jurisdiction in interstate child custody disputes. 9 U.L.A. 115–331 (pt. 1) (1988 & Supp.1994), codified in Arizona at A.R.S. §§ 8–401 to 8–424 and in Florida at Fla.Stat.Ann. (F.S.A.) §§ 61.1302 to 61.1348; *see also Greenlaw v. Smith*, 123 Wash.2d 593, 869 P.2d 1024, 1028 & n. 6, *cert. denied*, —— U.S. ——, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994). The stated purposes of the UCCJA are to:

1. Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being.

2. Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child.

3. Assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training and personal relationships is most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state.

4. Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child.

5. Deter abductions and other unilateral removals of children undertaken to obtain custody awards.

6. Avoid relitigation of custody decisions of other states in this state insofar as feasible.

7. Facilitate the enforcement of custody decrees of other states.

8. Promote and expand the exchange of information and other forms of mutual assistance between the courts of this state and those of other states concerned with the same child.

9. Make uniform the law of those states which enact the uniform child custody jurisdiction act.

A.R.S. § 8–401; *see also* F.S.A. § 61.1304. *See generally* Brigitte M. Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA,* 14 Fam.L.Q. 203, 204–13 (1981) (Professor Bodenheimer was the reporter for the UCCJA).

■ The UCCJA applies to adoption proceedings. *Adoption of Zachariah K.,* 6 Cal. App.4th 1025, 8 Cal.Rptr.2d 423, 428 (1992); *see also Adoption of Child by T.W.C.,* 270 N.J.Super. 225, 636 A.2d 1083, 1086 (App. 1994) (noting that the term "custody proceeding" as used in the UCCJA applies to disputes between natural parents and adoptive parents).

Section 3 of the UCCJA provides 4 alternative bases for conferring subject matter jurisdiction in a child custody dispute. *See* A.R.S. § 8–403; F.S.A. § 61–1308. *See generally* Anne B. Goldstein, *The Tragedy of the Interstate Child: A Critical Reexamination of the Uniform Child Custody Jurisdiction Act and the Parental Kidnapping Prevention Act,* 25 U.C.Davis L.Rev. 845, 887 (1992). Under the UCCJA, the trial court has jurisdiction to determine child custody if: (1) the state is the home state of the child at the time of commencement of the proceedings, or had been the home state within 6 months before commencement of the proceedings, and the child is absent from the state because of removal or retention by a person claiming custody or for other reasons, and a parent or person acting as a parent continues to live in the state (home state jurisdiction); (2) it is in the best interests of the child that the court exercise jurisdiction because the child and at least one parent or contestant have a "significant connection" with the state and there is "substantial evidence" in the state regarding the child's present or future care, protection, training, and personal relationships (significant connection jurisdiction); (3) the child is physically present in the state and has been abandoned, or an emergency requires the protection of the child because of abuse or neglect (emergency jurisdiction); or (4) no other state has jurisdiction under provisions 1 through 3 above, or another state declined jurisdiction on the ground that this state is the more appropriate forum (default or vacuum jurisdiction). *See* A.R.S. § 8–403(A); F.S.A. § 61–1308(1); *see also Juvenile Appeal J–78632,* 147 Ariz. 527, 531, 711 P.2d 1200, 1204 (App.1985), *approved in part, vacated in part,* 147 Ariz. 584, 712 P.2d 431 (1986) (approving court of appeals' opinion on jurisdiction issue).

Arizona adopted the UCCJA in 1978 and broadened the first basis of jurisdiction under the UCCJA to include "domicile" of the child, in addition to home state jurisdiction. A.R.S. § 8–403(A)(1) (Arizona court has jurisdiction if "[t]his state is the *domicile* or the home state of the child") (emphasis added); *Canty v. Canty,* 178 Ariz. 443, 446, 874 P.2d 1000, 1003 (App.1994). Otherwise, the Arizona and Florida statutes are virtually identical.

Also important to this case is the provision of the UCCJA regarding simultaneous proceedings in other states. A court "shall not exercise its jurisdiction [under the UCCJA] if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction *substantially in conformity with this chapter* [the UCCJA], unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons." A.R.S. § 8–406(A) (emphasis added); *see also* F.S.A. § 61.1314; *Vanneck v. Vanneck,* 49 N.Y.2d 602, 427 N.Y.S.2d 735, 738–39, 404 N.E.2d 1278, 1281 (1980). In furtherance of the spirit of cooperation, this section of the UCCJA also mandates that courts communicate with each other if proceedings are simultaneously pending in both states, and that they exchange information "to the end that the issue may be litigated *in the more appropriate forum.*" A.R.S. § 8–406(C) (emphasis added); *see also* F.S.A. § 61.1314; *Loper v. Superior Court,* 126 Ariz. 14, 17, 612 P.2d 65, 68 (App.1980).

### B. The Parental Kidnapping Prevention Act

The federal Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A, was enacted to "provide for nationwide enforcement of custody orders made in accordance with the terms of the UCCJA," to discourage interstate forum shopping in child custody cases, and, like the UCCJA, to discourage parental kidnapping of children. *Thompson v. Thompson,* 484 U.S. 174, 181, 108 S.Ct. 513, 517, 98 L.Ed.2d 512 (1988); *Sams v. Boston,* 181 W.Va. 706, 384 S.E.2d 151, 156 (1989). At the time Congress enacted the

PKPA, several states had not yet adopted the UCCJA or had adopted it with modifications. *Thompson,* 484 U.S. at 181, 108 S.Ct. at 517. Therefore, the PKPA was another attempt at producing some uniformity among the states in this area of the law. "[T]he principal problem Congress was seeking to remedy [with the PKPA] was the inapplicability of full faith and credit requirements to custody determinations." *Thompson,* 484 U.S. at 181, 108 S.Ct. at 517.

■ The PKPA, like the UCCJA, applies to adoption proceedings. *Adoption of Zachariah K.,* 8 Cal.Rptr.2d at 428. The PKPA requires that a state give full faith and credit to a child custody decree from another state if that other state complied with the provisions of the PKPA. 28 U.S.C. § 1738A(a); *see also Adoption of Child by T.W.C.,* 636 A.2d at 1087.

■ A state need not comply with the PKPA to exercise initial jurisdiction. *See* Goldstein, *The Tragedy of the Interstate Child,* at 925 (stating that, as a federal law, the PKPA does not grant or withhold jurisdiction, but only specifies which state decrees are entitled to enforcement). However, a state must comply with the PKPA if it wishes other states to give full faith and credit to its custody decrees.

■ The PKPA has jurisdiction requirements that are essentially the same as the UCCJA, with one very important exception—the PKPA prefers home state jurisdiction over significant connection jurisdiction. *See Atkins v. Atkins,* 308 Ark. 1, 823 S.W.2d 816, 819 (1992); *Sams,* 384 S.E.2d at 157 (stating that the PKPA makes it "judicially imprudent" for a court to exercise jurisdiction to enter an initial custody decree if another state has home state jurisdiction "and has not declined to exercise that jurisdiction"). Finally, if a state has exercised jurisdiction consistent with the PKPA, then that state has continuing jurisdiction over the modification of its custody decree as long as that court continues to have jurisdiction under the laws of that state and that state remains the residence of the child or person claiming a right to custody or visitation. 28 U.S.C. § 1738A(d).

## C. The Interstate Compact on the Placement of Children

The other applicable statute is the ICPC, which establishes a uniform system for placement of children in adoptive homes. *See In re Adoption 10087,* 324 Md. 394, 597 A.2d 456, 461 (1991) (explaining role of interstate compact). The ICPC is an interstate compact that has been adopted in all 50 states. Joan H. Hollinger, et al., 1 *Adoption Law and Practice,* § 3–A.03, at 93 (Supp.1994); *see also* A.R.S. § 8–548; F.S.A. § 409.401. Similar to the UCCJA and the PKPA, the purpose of the ICPC is to foster cooperation among the states in the placement of children and to promote "[a]ppropriate jurisdictional arrangements for the care of children." A.R.S. § 8–548, art. I; F.S.A. § 409.401, art. I; *see also* Bernadette W. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption,* 68 Neb.L.Rev. 292, 296 (1989).

■ The ICPC, like the UCCJA and the PKPA, applies to adoptions. *See* Joan H. Hollinger, et al., 1 *Adoption Law and Practice,* § 3–A.03, at 3A–4 (1991); Hartfield, *Role of the Interstate Compact,* at 313, 315 (concluding that ICPC applies to placement of child with prospective adoptive parents in another state and that "placement" includes when child moved to another state for possible adoption).

The ICPC is primarily procedural, providing a system of coordination among the states when a child born in one state is placed for adoption in another state. *See* Hollinger, 1 *Adoption Law,* § 3–A.01, at 3A–2 (1991) (noting that ICPC is not an adoption code). According to the terms of the ICPC, each state has a compact administrator who coordinates activities under the compact. A.R.S. § 8–548, art. VII; F.S.A. § 409.401, art. VII; *see also* Hartfield, *Role of the Interstate Compact,* at 301. Certain information must be supplied to the state to which the child is moving, and the compact administrators of both states must approve the placement. Among the information to be provided is a homestudy, which evaluates the prospective adoptive parents. Hollinger, 1 *Adoption Law,* § 3–A.05, at 3A–5, 3A–6 (1991).

According to the ICPC, the "sending agency" shall not send the child to another state for placement unless the sending agency has complied with the requirements of the ICPC and the applicable laws of the receiving state regarding the placement of children. A.R.S. § 8–548, art. III(a); F.S.A. § 409.401, art. III(a); *see also Juvenile Appeal 18635,* 125 Ariz. 430, 432, 610 P.2d 64, 66 (1980). The sending agency must furnish certain information to "the appropriate public authorities in the receiving state," including the identity and address of the parents. A.R.S. § 8–548, art. III(b); F.S.A. § 409.401, art. III(b). However, the ICPC does not require that the sending agency give notice of the placement to the biological parents.

"Sending agency" is broadly defined to include any arm of the state, the court, a person, or an entity sending, bringing, or causing to be sent a child to another state. A.R.S. § 8–548, art. II(b); F.S.A. § 409.401, art. II(b). A parent can be the sending agency. Hartfield, *Role of the Interstate Compact,* at 309. The term "placement" includes "the arrangement for the care of a child in a family free." A.R.S. § 8–548, art. II(d); F.S.A. § 409.401, art. II(d). "Family free" is not defined, but has been interpreted to mean a home where the child lives without charge and receives "the care which children usually receive from their parents as part of the process of upbringing." Hartfield, *Role of the Interstate Compact,* at 298, quoting American Public Welfare Association, I *The Interstate Compact on the Placement of Children: Compact Administrators' Manual* 2.2 (1982) (interpretative commentary on ICPC provisions).

## II. *Analysis*

### A. Standard of Review

■ We review de novo as a question of law whether a court has jurisdiction under the UCCJA. *See Adoption of Baby Girl B.,* 19 Kan.App.2d 283, 867 P.2d 1074, 1078 (1994). A trial court's decision to defer jurisdiction to another court when both courts properly had jurisdiction is reviewed for an abuse of discretion. *See Adoption of Baby Girl B.,* 867 P.2d at 1078–79.

## B. Florida's Jurisdiction Under the UCCJA

The pivotal issue in this case is whether the Florida court is exercising its jurisdiction substantially in conformity with the UCCJA. If so, the Arizona trial court did not abuse its discretion in deferring to the Florida trial court. See Vanneck, 427 N.Y.S.2d at 738–40, 404 N.E.2d at 1281–82; see also Adoption of Zachariah K., 8 Cal.Rptr.2d at 430. The issue is not whether Arizona lacked jurisdiction over this matter, but rather whether the Arizona trial court was correct in declining to exercise the jurisdiction that it had. See Both v. Superior Court, 121 Ariz. 381, 384, 590 P.2d 920, 923 (1979) (noting distinction between lack of jurisdiction and non-exercise of jurisdiction), quoting McNeal v. Mahoney, 117 Ariz. 543, 546, 574 P.2d 31, 34 (1977).

The UCCJA states unequivocally that Arizona shall not exercise its jurisdiction if, at the time of filing the petition, a custody proceeding was pending in another state and the other state court was exercising its jurisdiction substantially in conformity with the UCCJA. A.R.S. § 8–406(A); see also F.S.A. § 61.1314(1). Florida is substantially in conformity if it meets one of the jurisdictional requirements set forth in § 3 of the UCCJA. See A.R.S. § 8–406; see also F.S.A. § 61.1308. The Arizona statute requires that the foreign state shall be in conformity "with this chapter." Therefore, we must determine whether Florida has met the jurisdictional requirements set forth in Arizona's version of § 3 of the UCCJA. See, e.g., Dobyns v. Dobyns, 650 S.W.2d 701, 705 (Mo. App.1983) (analyzing whether Missouri must defer to Nevada custody decree by determining whether Nevada court complied with Missouri version of UCCJA).

■ The father argues that Arizona had been the home state within 6 months before the commencement of the adoption proceedings. The PKPA prefers home state jurisdiction over significant connection jurisdiction. See 28 U.S.C. § 1738A(c)(2)(B). Thus, if Arizona has home state jurisdiction and Florida only has significant connection jurisdiction, the federal statute will not require states to give full faith and credit to orders of the Florida courts. Furthermore, many cases have voiced a preference for home state jurisdiction under the UCCJA. See, e.g., Grayson v. Grayson, 454 A.2d 1297, 1299 (Del.Fam.Ct.1982) (citing several authorities for proposition that home state has jurisdictional priority); see also In re Fathom K., 173 Cal.App.3d 773, 219 Cal.Rptr. 294, 296 (1985); Hafer v. Superior Court, 126 Cal. App.3d 856, 179 Cal.Rptr. 132, 137–38 (1981) (stating that the "children's home is the presumptively correct forum").

Clearly, Florida is not the child's home state. "Home state" is defined as "the state in which the child immediately preceding the time involved lived with his parents, a parent or a person acting as parent for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with any of the persons mentioned." A.R.S. § 8–402(5); see also F.S.A. § 61–1306(5). The child was less than 6 months old when the proceedings were commenced and had lived from birth to almost the time of filing with a parent, her mother, in Arizona. See A.R.S. § 8–402(5); see also F.S.A. § 61–1306(5).

We conclude that Arizona had been the child's home state within 6 months before the commencement of the proceedings, but that the Florida court could properly exercise jurisdiction under the emergency provision of the UCCJA. As discussed below, Florida could have found that there was an emergency because of the poor condition of the baby's health.

Although we find that Arizona had been the home state and could exercise home state jurisdiction, this home state conclusion is of less weight than it would be in the typical case where the parent who had custody of the child is contesting the adoption. Here, the mother, with whom the child had lived, is not contesting the adoption. It is the father, with whom the child never lived, who is contesting the adoption.

■ The purpose of the 6–month requirement in the UCCJA home state jurisdictional basis is to discourage child snatching. Dobyns, 650 S.W.2d at 705; Sams, 384 S.E.2d at 158–59. This is not a case where a parent has surreptitiously snatched the child and

transported her to another state. *See Both*, 121 Ariz. at 384, 590 P.2d at 923 (stating that UCCJA was enacted to deter practice of child snatching, when one parent takes child to different jurisdiction in hopes of obtaining more favorable custody decree). The adoptive parents are not hiding the child and were acting legally when transporting the child.

There is one further conundrum under Arizona's version of "home state" jurisdiction. The Arizona statute states that "Arizona is vested with jurisdiction to make a child custody determination ... if ... [t]his state is the *domicile* or the home state of the child at the time of commencement of the proceeding or had been the child's *domicile* or home state within six months before commencement of the proceeding." A.R.S. § 8–403(A)(1) (emphasis added). The child's domicile at the time of commencement of the Florida adoption proceeding was Arizona.

▮▮▮▮ "Domicile" is not defined in the UCCJA. *See* A.R.S. § 8–402; *see also* F.S.A. § 61.1306 (definitions relevant to UCCJA do not include "domicile"). Arizona has defined "domicile" as "primarily a state of mind combined with actual physical presence in the state.... One's domicile remains unchanged until a new one is acquired." *Clark v. Clark*, 124 Ariz. 235, 237, 603 P.2d 506, 508 (1979) (defining "domicile" in divorce matter), quoting *Arizona Bd. of Regents v. Harper*, 108 Ariz. 223, 228, 495 P.2d 453, 458 (1972). A domicile is where a person intends to remain and make a home. *Clark*, 124 Ariz. at 237, 603 P.2d at 508. A child born in Arizona acquires Arizona as her domicile at birth. *DeWitt v. McFarland*, 112 Ariz. 33, 33, 537 P.2d 20, 20 (1975). The domicile of a child born out of wedlock is her mother's and remains so, even if the child is placed in another state with adoptive parents, until the child's domicile is legally changed. *Juvenile Appeal S–903*, 130 Ariz. 202, 206, 635 P.2d 187, 191 (App.1981) (holding that even though child was living in Arizona with adop-

tive parents pursuant to temporary custody order, child's domicile was Montana where birth mother was domiciled). Therefore, Arizona could exercise jurisdiction under A.R.S. § 8–403(A)(1), because Arizona was the domicile of the baby when the proceeding was commenced.

However, this is not dispositive of the matter. The Arizona proceeding was not filed first, so the question is not whether Arizona had jurisdiction, but whether Florida was exercising its jurisdiction in substantial conformity with the UCCJA. The UCCJA, as enacted by Arizona, does not set priorities for the jurisdictional options. A.R.S. § 8–403; *see also Canty*, 178 Ariz. at 446, 874 P.2d at 1003 (holding that presumption established in *Carlson v. Brown* in favor of domicile jurisdiction is not viable in regard to modification of custody decrees, but not addressing initial jurisdiction issue). *But see Carlson v. Brown*, 118 Ariz. 387, 391, 576 P.2d 1387, 1391 (App.1978) (stating that UCCJA creates a presumption in favor of exclusive exercise of jurisdiction in the domicile state). The PKPA, which is applicable to this case, does not enunciate "domicile" as a jurisdictional option.

In *Loper v. Superior Court*, the Arizona Court of Appeals noted that Arizona is the only state (at least when that opinion was filed in 1980) to include "domicile" in its version of the UCCJA. 126 Ariz. at 16, 612 P.2d at 67.[4] In that case, the domicile of the child was Arizona, and the Arizona proceeding preceded the Alaska proceeding; therefore, the trial court concluded that Arizona had jurisdiction. *Loper*, 126 Ariz. at 16, 612 P.2d at 67. However, the court of appeals also held that the trial court should have consulted the Alaska court to determine whether Arizona was a forum non conveniens. *Loper*, 126 Ariz. at 18, 612 P.2d at 69. Here, the Arizona case was not first in time, and further, unlike the trial court in *Loper*, the Arizona trial court did consult with the

**4.** In 1990, Utah amended its version of the UCCJA and inserted "domicile" in the emergency jurisdiction provision as follows: "A court of this state ... has jurisdiction to make a child custody determination ... if ... (c) the child is physically present in this state *or this state is the most recent domicile of the mother prior to the birth of the child*, and: (i) the child has been abandoned; or (ii) it is necessary in an emergency to protect the child...." Utah Code Ann. § 78–45c–3 (emphasis added).

Florida trial court. Therefore, we conclude that there is no domicile priority under the UCCJA, and if Florida has jurisdiction under another section of the UCCJA, then Florida is in substantial conformity, and Arizona must defer.

■ Turning to the second alternative under the UCCJA, significant connection jurisdiction, both Arizona and Florida could legitimately exercise jurisdiction under this option because both states have a significant connection to the child, and both states have substantial evidence regarding the child's "present or future care, protection, training and personal relationships." A.R.S. § 8–403(A)(2); *see also* F.S.A. § 61–1308(1)(b).[5]

Florida has a significant connection because the child is physically present in that state, as are the adoptive parents. Arizona also has a significant connection because the child spent her first 4 months in Arizona, and because both of her biological parents reside in Arizona. The adoptive parents argue that the mother's presence is irrelevant because she has consented to the adoption. We disagree. For example, aside from her consent to the adoption, the biological mother could provide relevant evidence about the father's ability to care for the child. Here, both states have significant connection jurisdiction. However, as stated earlier, under the PKPA, home state jurisdiction has priority over significant connection jurisdiction. Therefore, if Florida's only basis for exercising jurisdiction was significant connection, it would contravene the PKPA.

The adoptive parents argue that Florida may also have properly exercised jurisdiction under the third alternative, emergency jurisdiction. Such jurisdiction is proper when the child is physically present in the state and "has been subjected to or threatened with mistreatment or abuse." A.R.S. § 8–403(A)(3); *see also* F.S.A. § 61–1308(1)(c); *Lofts v. Superior Court*, 140 Ariz. 407, 411, 682 P.2d 412, 416 (1984) (finding that evi-

dence supported jurisdiction based on the significant connection or emergency provisions of the UCCJA). The adoptive parents argue that the Florida trial court could have found emergency jurisdiction based on Dr. Fortunato's statement that "[the baby] will deteriorate quickly if her progress is interrupted or she returns to the level of care she obviously received prior to [G.H. and K.H.] obtaining her. . . . She is in severe jeopardy should she return to the environment in Arizona that allowed such a condition to develop." We conclude that based on this evidence the Florida trial court could have exercised jurisdiction under the emergency basis.

The fourth basis of jurisdiction under the UCCJA, default or vacuum jurisdiction, does not apply to this case. A.R.S. § 8–403(4); *see also* F.S.A. § 61.1308(d); *State ex rel. Rashid v. Drumm*, 824 S.W.2d 497, 502 (Mo. App.1992); *In re B.R.F.*, 669 S.W.2d 240, 247–48 (Mo.App.1984). This section only applies when jurisdiction does not exist under the first three options listed above, or another state has declined jurisdiction. At the time Florida assumed jurisdiction, Florida could exercise significant connection jurisdiction or emergency jurisdiction, and neither Arizona nor any other state had declined jurisdiction.

## C. ICPC Procedures

■ The biological father contends that the adoptive parents did not comply with the ICPC, and therefore Arizona should not defer jurisdiction to Florida. The UCCJA determines which court should proceed with its jurisdiction. *See* Hollinger, 1 *Adoption Law*, § 3–A.11, at 3A–15 (1991). Compliance with the ICPC is not a prerequisite for exercising jurisdiction. *Adoption 10087*, 597 A.2d at 465. The ICPC merely establishes a procedure to follow when a placement is made. *See Adoption of Child by T.W.C.*, 636 A.2d at 1086. Nevertheless, a possible sanction for

---

5. This provision has consistently been interpreted to require "maximum" rather than "minimum" contacts. *See, e.g., Both*, 121 Ariz. at 383, 590 P.2d at 922 ("The interest of the child is served when the forum has optimum access to relevant evidence about the child and family. There must be maximum rather than minimum

contact with the state."), quoting UCCJA § 3 cmt., 9 U.L.A. at 145 (pt. 1); *Grayson*, 454 A.2d at 1300 ("The term 'significant connection' is authoritatively defined as *maximum* rather than *minimum* contact with the state and is intended to *limit jurisdiction* rather than to proliferate it.").

noncompliance may be retention of jurisdiction in the sending state. *See, e.g., In re Baby Girl,* 850 S.W.2d 64, 68–69 (Mo.1993). *But see Adoption 10087,* 597 A.2d at 466 (finding that best solution for placement of child in violation of ICPC was retroactive compliance). Because we conclude, however, that the placement of the minor child was in compliance with the ICPC procedures, we need not discuss what the proper sanction would be for noncompliance.

■ The ICPC commands that "[n]o sending agency shall send ... into any other party state any child ... as a preliminary to a possible adoption unless the sending agency ... compl[ies] with each and every requirement set forth in this article *and* with the applicable laws of the receiving state governing the placement of children therein." A.R.S. § 8–548, art. III(a) (emphasis added); F.S.A. § 409.401, art. III(a); *see also Juvenile Appeal 18635,* 125 Ariz. at 432, 610 P.2d at 66. In this case, the ICPC sending agency was the mother, K.W. She consented to the adoption, and at the time the Florida proceedings were commenced, J.D.S. had not established paternity. K.W. did not notify J.D.S. of the adoption until after she had signed the adoption papers and the baby was transferred to Florida.

■ The mother provided all necessary documentation to the Arizona and Florida offices of the ICPC. K.W. submitted ICPC Form 100A—Interstate Compact Placement Request. On this form, the blank for "Name of Father" was not completed. Also on this form is a section titled "Legal Status." In this section, the box titled "Parental Rights Terminated—Right to Place for Adoption" was marked. In fact, the parental rights of J.D.S. had not been terminated. The Arizona Compact Administrator, Michael Chapman, attested that this box is used to indicate that a parent with the right to sign a consent for adoption has signed such a consent. Chapman noted that the biological mother had consented, and he assumed that the biological father had not consented because no consent was attached. He further assumed that the receiving state, Florida, would determine whether the father's consent was necessary. Chapman knew that Florida did not require that information on the biological father be included on the ICPC Form 100A.[6]

In addition, the ICPC documentation included an Affidavit as to Birth Father, which listed J.D.S.'s name and address and accurately stated that J.D.S. had not acknowledged his paternity as of that time and had not adopted the child. Although this affidavit also contained some apparent untruths about the father, the affidavit and other sup-

6. In Florida, consent to adoption of a minor child is needed from the father only if: (1) the minor was conceived or born while the father was married to the mother, (2) the minor is his by adoption, (3) paternity has been established by court proceeding, or (4) the father has acknowledged paternity in writing and filed such acknowledgment with the vital statistics office. F.S.A. § 63.062(1)(b). Notice of any hearings on a petition for adoption must be given to "[a]ny person whose consent to the adoption is required by this act who has not consented, unless such person's consent is excused by the court." F.S.A. § 63.122(4)(c).

Arizona's statute regarding obtaining consent from the father is similar. *See* A.R.S. § 8–106(A)(2). However, in 1994, this statute was amended to require that the mother serve notice on each potential father and inform the potential father that: (1) the adoption is planned, (2) he has the right to consent or withhold consent to the adoption, (3) he has the responsibility to initiate paternity proceedings within 30 days of service, (4) he has the right to seek custody, and (5) he has the responsibility to provide financial

support for the minor child if paternity is established. Laws 1994, Ch. 116, § 1; A.R.S. § 8–106(G).

These consent laws are not part of the UCCJA. These laws are part of each state's substantive law on adoption. Because this case involves a Florida adoption proceeding, and because the ICPC requires the sending agency to comply with the laws of the receiving state, only the Florida statute on consent is relevant to this case. *See* A.R.S. § 8–548, art. III(a); F.S.A. § 409.401, art. III(a); *cf. Juvenile Appeal B–7087,* 118 Ariz. 428, 430, 577 P.2d 714, 716 (1978) (holding that Arkansas law, not Arizona law, should determine validity of consent to adopt when consent form prepared in anticipation of Arkansas adoption). Consequently, even if the adoption proceeding had commenced after the new Arizona statute was enacted, the result in this case would not be different. In fact, even if this were an Arizona adoption, whether the father's consent was needed is only relevant to the merits of the adoption case, and probably does not affect the decision regarding which court has jurisdiction over the proceeding.

porting documents were truthful regarding all operative facts. We conclude that the procedural requirements of the ICPC were met.

### D. ICPC Article V(a)

 The father also argues that Arizona should not defer jurisdiction to Florida because ICPC article V(a) states that "[t]he sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody ... of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted." We disagree with the father here as well. Recent authority has held that article V, despite its language, does not always require the sending state to exercise jurisdiction in adoption disputes. We think it would be counterproductive to interpret the ICPC as negating the jurisdictional provisions of the UCCJA, a set of statutes specifically enacted to control subject matter jurisdiction.

For example, in a factually similar case, a California court found that the mother was the sending agency under the ICPC. *See Adoption of Zachariah K.,* 8 Cal.Rptr.2d at 431. In that case, an unwed mother gave birth to her child in California and placed the child with a family in Oregon for adoption. *Id.* at 425. The mother later tried to rescind her consent arguing, among other things, that the biological father had not consented to the adoption. *Id.* The mother argued, as does the father in this case, that under the ICPC the sending agency retains jurisdiction over the child. *Id.* at 431. The California court found that the sending agency—the mother—had the power to "effect or cause the child's transfer to another location and custody," and consequently had the power to consent to the adoption. *Id.*

Recent authorities have followed *Zachariah K.* and interpret the ICPC provision regarding the sending agency retaining jurisdiction as follows:

[T]his ICPC provision does not preclude the sending agency from transferring its responsibility to some other entity in the receiving state, including the prospective adoptive parents.... Nor does this ICPC

provision empower the courts of the state in which a sending agency is located to exercise jurisdiction over an adoption proceeding. The validity of a court's exercise of jurisdiction depends on the UCCJA and PKPA, not the ICPC.

Hollinger, 1 *Adoption Law,* § 3–A.11, at 99 (Supp.1994). We conclude that article V of the ICPC does not require Arizona to exercise jurisdiction in this case.

### E. Arizona Properly Declined to Exercise Jurisdiction

We conclude that Florida was exercising jurisdiction substantially in conformity with the UCCJA. Therefore, the Arizona trial court did not abuse its discretion by deferring to the Florida trial court, even though the Arizona trial court also had jurisdiction. Florida could properly have exercised jurisdiction pursuant to the emergency jurisdiction provision, in compliance with both the UCCJA and the PKPA. Arizona could have exercised jurisdiction based on the significant connection provision or the home state and domicile provision.

According to Arizona law, the trial court had to defer because A.R.S. § 8–406 mandates that the Arizona court *"shall not* exercise its jurisdiction" if another proceeding was commenced first in another state and that state is exercising its jurisdiction substantially in conformity with the UCCJA. *See Ward v. Huggins,* 177 Ariz. 61, 62, 865 P.2d 105, 106 (1993) (stating that, under § 406, the court "must decline to exercise [jurisdiction] if simultaneous proceedings are pending in a court in another state").

Further, the Arizona trial court conferred with the Florida trial court as required by the UCCJA, and all parties, including J.D.S. and his attorney, participated in the hearing, some by telephone. *See* A.R.S. § 8–406(C); *see also* F.S.A. § 61.1314(3); *cf. Juvenile Appeal J–78632,* 147 Ariz. at 534, 711 P.2d at 1207 (holding that Arizona court had jurisdiction under emergency provision of UCCJA, but that court should have communicated with Arkansas court before exercising that jurisdiction). In this case, the goal of the UCCJA, cooperation among states with competing jurisdictional claims, was met because

 

the Arizona and Florida trial courts consulted with each other and agreed on the correct forum for this dispute—Florida.

## III. *Other Issues*

### A. Writ of Habeas Corpus as the Procedure to Determine Custody

J.D.S. filed a writ of habeas corpus in Arizona demanding that the child be returned. Although we have held that habeas is the proper procedure for testing custody, we have not addressed the issue of whether habeas is the proper procedure to use when the child is out of state. *See, e.g., Juvenile Appeal A–26961,* 135 Ariz. 228, 230, 660 P.2d 479, 481 (App.1982) (stating that habeas corpus may be used to contest custody of an in-state child). Because we need not decide this issue to resolve this case, we will leave it to another day.

### B. Father's Due Process Rights

The biological father also has stressed that his due process rights have been violated. We do not deny that a parent's right to control and custody of his children is a fundamental right, and the state cannot deprive a parent of this relationship without due process. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Juvenile Severance S–114487,* 179 Ariz. 86, 93, 876 P.2d 1121, 1128 (1994). However, J.D.S.'s due process rights will be protected in Florida just as they would be in Arizona. "There is no reason why the courts of one state should not be able to 'assume with confidence that the courts of the other jurisdiction will act with wisdom and sincerity in all matters pertaining to the welfare of this child.'" *Palm v. Superior Court,* 97 Cal.App.3d 456, 158 Cal. Rptr. 786, 793 (1979), quoting *Ferreira v. Ferreira,* 9 Cal.3d 824, 109 Cal.Rptr. 80, 91 n. 21, 512 P.2d 304, 315 n. 21 (1973).

The father has participated in the Florida proceedings and appeared in that court. Furthermore, the UCCJA, as enacted by Florida, includes due process protections, stating that "[b]efore a decree is made under [the UCCJA], reasonable notice and opportunity to be heard shall be given to ... any

parent whose parental rights have not been previously terminated.... If any of these persons is outside this state, notice and opportunity to be heard shall be given pursuant to § 61.1312." F.S.A. § 61.131; *see also* A.R.S. §§ 8–404 & 8–405.

### *Conclusion*

Both Arizona and Florida complied with the requirements of the ICPC, and the Florida court exercised jurisdiction in substantial conformity with the UCCJA. Therefore, the Arizona trial court correctly deferred jurisdiction over this matter to the Florida court after communicating with the Florida trial court. We vacate the opinion of the Arizona Court of Appeals and affirm the judgment of the Arizona trial court to defer jurisdiction over this child custody matter to the Florida court.

FELDMAN, C.J., MOELLER, V.C.J., and ZLAKET and MARTONE, JJ., concur.